**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

MARK JAMES ASAY,

        Petitioner,

v.                                                           Case No. 3:16-cv-43-J-32JRK

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

        Respondents.

_____

## **ORDER**

### **I. Status**

In 1988, Petitioner was convicted of two counts of first degree murder. The jury recommended a death sentence for each conviction by a nine-to-three vote, and the trial court imposed a sentence of death for each conviction. Petitioner previously filed a federal habeas corpus petition that this Court denied on the merits on April 14, 2014. See Order (Doc. 152), No. 3:05-cv-147-J-32PDB. Petitioner appealed the judgment but voluntarily dismissed the appeal prior to the Eleventh Circuit issuing a decision. See Order of United States Court of Appeals for the Eleventh Circuit (Doc. 157), No. 3:05-cv-147-J-32PDB.

On July 3, 2017, the Governor set Petitioner's execution for August 24, 2017.[1] On July 10, 2017, Petitioner, through counsel, filed a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus (Doc. 8) (Petition), in which he raises two grounds. First, he claims that the State withheld favorable information and presented materially inaccurate testimony at trial which resulted in violations of Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments. Second, he asserts that new scientific evidence shows that the testimony of the State's firearm examiner was materially inaccurate and violated Petitioner's rights under the Eighth and Fourteenth Amendments. Petitioner also filed a discovery motion requesting access to the five bullets removed from the two victims (Doc. 13) and a motion to stay his execution (Doc. 15). Respondents filed a Motion to Dismiss (Doc. 17) (Motion) arguing that the Petition is an unauthorized second or successive petition. Alternatively, Respondents address the merits. Respondents also filed responses to Petitioner's other pending motions (Docs. 18, 19). Petitioner filed a Response to the Motion to Dismiss (Doc. 22) (Response). The Court finds that the Petition is a second or successive petition filed without the Eleventh Circuit's approval; thus, this Court lacks jurisdiction to consider it.[2]

---

[1] The Governor signed the death warrant for both death sentences on January 8, 2016, and the execution was originally scheduled for March 17, 2016. Pending the result of some state court proceedings, the Florida Supreme Court stayed the execution from March 2, 2016, to February 1, 2017. After the stay was lifted, but during the pendency of Petitioner's petition for writ of certiorari in the United States Supreme Court, see Asay v. Florida, No. 16-9033 (filed Apr. 29, 2017), the Governor reset the execution for August 24, 2017. The petition for writ of certiorari remains pending.

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which,

## **II. Procedural History**

In the opinion affirming Petitioner's judgment of conviction on direct appeal, the Florida Supreme Court summarized the trial proceedings as follows:

> According to testimony of Asay's brother, Robbie, and Robbie's friend, "Bubba" McQuinn, on July 17, 1987, the three met at a local bar where they drank beer and shot pool. They left the bar around 12:00 a.m. and went to a second bar where they stayed until closing at 2:00 a.m. Although Asay drank a number of beers, both Bubba and Robbie testified that Asay did not appear drunk or otherwise impaired.
>
> After the bar closed, Robbie said he wanted to try to "pick up a girl" he had seen at the bar, so Bubba and Asay drove around the corner in Asay's truck. They returned to discover that Robbie had been unsuccessful with the girl he had seen, so Bubba suggested that they go downtown to find some prostitutes and he would pay for oral sex for them all. Asay and Bubba left in Asay's truck and Robbie left in his. Once downtown, Asay and Bubba soon spotted Robbie who was inside his truck talking to a black man, Robert Lee Booker. Robbie was telling Booker[,] who was standing at the driver's side window of Robbie's truck[,] that he and his friends were looking for prostitutes.
>
> After spotting Booker standing by Robbie's truck, Asay told Bubba to pull up next to the truck. Asay immediately got out of his truck, proceeded to Robbie's truck, and told Robbie "You know you ain't got to take no s--t from these f---ing niggers." Although Robbie told Asay that "everything is cool," Asay began to point his finger in Booker's face and verbally attack him. When Booker told him "Don't put your finger in my face," Asay responded by saying "F--k you, nigger" and pulling

---

if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. The facts necessary to determine whether the Petition is second or successive are fully developed in the record; thus, an evidentiary hearing will not be conducted.

his gun from his back pocket, shooting Booker once in the abdomen. Booker grabbed his side and ran. According to the medical examiner, the bullet perforated the intestines and an artery causing internal hemorrhaging. Booker's body was later found under the edge of a nearby house.

Robbie drove away immediately after the shooting. Asay jumped into the back of his truck, as Bubba drove off. When Asay got into the cab of the truck, Bubba asked him why he shot Booker. Asay responded, "Because you got to show a nigger who is boss." When asked if he thought he killed Booker, Asay replied, "No, I just scared the s--t out of him."

Bubba testified that after the shooting, Asay and Bubba continued to look for prostitutes. According to Bubba, he saw "Renee" who he knew would give them oral sex. It appears that at the time neither Bubba nor Asay was aware that "Renee" was actually Robert McDowell, a black man dressed as a woman. According to Bubba, he negotiated a deal for oral sex for them both. Bubba drove the truck into a nearby alley. McDowell followed. Bubba testified that McDowell refused to get into the truck with them both, so Asay left the truck and walked away to act as a lookout while Bubba and McDowell had sex. As McDowell started to get into the truck with Bubba, Asay returned, grabbed McDowell's arm, pulled him from the truck and began shooting him. McDowell was shot six times while he was backing up and attempting to get away. Asay jumped back in his truck and told Bubba to drive away. When asked why he shot McDowell, Asay told Bubba that he did it because "the bitch had beat him out of ten dollars" on a "blow job." McDowell's body was found on the ground in the alley soon after the shots were heard. According to the medical examiner, any of three wounds to the chest cavity would have been fatal.

Asay later told Charlie Moore in the presence of Moore's cousin, Danny, that he shot McDowell because McDowell had cheated him out of ten dollars on a drug deal and that he had told McDowell, "if he ever got him that he would get even." Asay told Moore that he was out looking for "whores," when he came across McDowell. According to Moore's cousin, Danny, Asay also told Moore that his plan was to have Bubba get McDowell in the truck and they "would take her off and screw

4

her and kill her." Moore testified that Asay told him that when Bubba "didn't have [McDowell] in the truck so they could go beat him up," Asay "grabbed [McDowell] by the arm and stuck the gun in his chest and shot him four times, and that when he hit the ground, he finished him off." As a result of tips received from Moore and his cousin after McDowell's murder was featured on a television Crime Watch segment, Asay was arrested and charged by indictment with two counts of first-degree murder.

The state also presented testimony of Thomas Gross, who was Asay's cellmate while he was awaiting trial. Gross testified that when the black prisoners, who were also housed in their cell, were out in the recreation area, Asay told him he was awaiting trial for a couple of murders. According to Gross, Asay then showed him some newspaper articles and told him, "I shot them niggers." While they were discussing the murders, Asay showed Gross his tattoos, which included a swastika, the words "White Pride," and the initials "SWP" which Gross said stand for supreme white power.

Asay was found guilty of both murders. In accordance with the jury's recommendations, the trial court imposed a sentence of death for each conviction. The following two aggravating factors were found in connection with both murders: 1) the murder was committed by a person under sentence of imprisonment because Asay was on parole; and 2) Asay had been previously convicted of a capital felony based on the contemporaneous murder conviction. § 921.141(5)(a), (b), Fla. Stat. (1987). In connection with the McDowell murder, the court found a third aggravating factor, that the murder was committed in a cold, calculated, and premeditated manner, without any pretense of any moral or legal justification. § 921.141(5)(i), Fla. Stat. (1987). Asay's age of twenty-three at the time of the offenses was found in mitigation as to both murders. § 921.141(6)(g), Fla. Stat. (1987).

Asay v. State, 580 So. 2d 610, 610-12 (Fla. 1991).

Petitioner filed postconviction proceedings in state court, and as previously noted, a federal habeas petition in this Court which the Court denied on the merits. Years later, after

5

the death warrant was signed in 2016, Petitioner initiated another round of postconviction proceedings in state court. The circuit court and the Florida Supreme Court both denied Petitioner relief, and Petitioner currently has a petition for writ of certiorari pending in the United States Supreme Court.[3] See Asay v. Florida, No. 16-9033 (filed Apr. 29, 2017). Because the Governor scheduled Petitioner's execution, Petitioner filed the instant Petition. See Memorandum at 2 n.1.

### III. Discussion

The Antiterrorism and Effective Death Penalty Act (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S. Ct. 1432 (2017). AEDPA bars the filing of a second or successive habeas petition, absent approval from the appropriate court of appeals. See 28 U.S.C. § 2244(b)(3)(A) ("Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application."); see also Insignares v. Sec'y, Fla. Dep't of Corr., 755 F.3d 1273, 1278 (11th Cir. 2014) (finding that "[s]ubject to [certain] exceptions[,] . . . a district judge lacks jurisdiction to decide a second or successive petition filed without [the Eleventh Circuit's] authorization"). The court of appeals may authorize the filing of a second or successive petition if the petition "makes a prima facie showing" of one of two narrow statutory exceptions:

---

[3] The issues presented in the instant Petition are also presented in the petition for writ of certiorari pending in the Supreme Court.

> (A) . . . the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2), (b)(3)(C). This standard was meant to be high, because "[t]he statutory bar against second or successive [petitions] is one of the most important AEDPA safeguards for finality of judgment." In re Hill, 715 F.3d 284, 290 (11th Cir. 2013) (citation omitted). "The central purpose behind the AEDPA was to ensure greater finality of state and federal court judgments in criminal cases, and to that end its provisions greatly restrict the filing of second or successive petitions." Id. (quotations and citation omitted).

The Eleventh Circuit has not authorized Petitioner to file a second or successive petition; indeed, Petitioner has not sought the Eleventh Circuit's approval. Rather, Petitioner claims that the instant Petition is not "second or successive," and thus he does not need the Circuit's approval.

In support of his position, he argues that in January 2016, his counsel received previously undisclosed records from the Jacksonville Sheriff's Office that showed the following: (1) months before Petitioner's trial, Booker's (the victim of the first shooting) identity was still in doubt; (2) Booker's sister advised law enforcement that Booker had been "cut up" on Beaver and Davis Streets, and Booker's brother informed Detective Housend that

7

Booker had been robbed a week before being killed and when Booker retaliated, he was killed; (3) an individual named "Yankee"[4] told police that Booker had been shot during a drug deal by Roland Pough and that Pough was known to carry a .25 caliber automatic firearm; (4) after Booker's murder, Pough was unjustifiably shot by police when the police attempted to intervene in a drug deal and Pough was never questioned about Booker's murder; (5) Selwyn Hall told Detective Housend that Pough was a drug dealer and that Pough told Hall that he shot a black male during a robbery attempt about three blocks from where Booker's body was found; (6) an individual named "O.J." knew that Pough shot Booker; (7) the State, through Detective Housend's deposition, provided a misleading account about the evidence implicating Pough in the Booker homicide; (8) in a pretrial statement given to law enforcement, Joseph Knight, the individual who found Booker's body, provided a timeline that was more favorable to Petitioner, but in Detective Housend's pretrial deposition, he provided an incomplete description of Knight's timeline; (9) an individual who described the pickup truck last seen with McDowell (the second murder victim) owned a Raven automatic firearm; and (10) notes from Charlie Moore's pretrial statements to police contradicted his trial testimony.[5] See Petition at 35-43.[6] Additionally, in 2016, Petitioner's "counsel retained

---

[4] Petitioner discusses Yankee and Selwyn Hall as two separate individuals. According to Respondents, Yankee was a nickname for Selwyn Hall. See Motion at 9 n.1.

[5] Respondents admit that "the State did not disclose the actual 1987 homicide supplemental report and handwritten notes that referred to Roland Pough" until 2016. Motion at 16. However, according to Respondents, "the State disclosed the substance of the report and notes [prior to trial] by disclosing that Roland Pough was initially a suspect." Id.

[6] This information is taken directly from the Petition. The actual source documents that were disclosed in 2016 are under seal in state court and this Court has not independently reviewed them because it is not necessary to the Court's decision on whether the Petition

8

William A. Tobin, a former forensic metallurgist/materials scientist with the Federal Bureau of Investigation," who opined in an affidavit that "the jury in [Petitioner's] case heard inadmissible and highly unreliable, misleading and inaccurate testimony" from the State's firearm examiner. Memorandum at 30-31. Petitioner argues that the two grounds raised in the instant Petition "were not ripe when he filed a § 2254 petition in 200[5,]" because he did not have an adequate factual basis for the claims until he obtained the above-described information in 2016. Id. at 20. Thus, Petitioner concludes that the instant Petition is not second or successive.

Petitioner relies on the United States Supreme Court's decision in Panetti v. Quarterman, 551 U.S. 930, 945 (2007). In Panetti, the Court concluded that AEDPA's bar on second or successive habeas petitions did not apply "in the unusual posture presented [t]here: a § 2254 application raising a Ford[7]-based incompetency claim filed as soon as that claim is ripe." Because a Ford claim is not ripe until an execution is imminent, a petitioner is likely unable to bring such a claim in his first federal habeas proceeding. See id. at 946-47. Thus, a second-in-time petition raising a Ford claim that is filed when the claim is first ripe (when execution is imminent) is not barred as "second or successive." Id. at 947.

Like Petitioner, other death row inmates have attempted to extend Panetti to second-in-time habeas petitions raising Brady[8] and Giglio[9] claims. In Tompkins, a prisoner on

---

is successive.

[7] Ford v. Wainwright, 477 U.S. 399 (1986).

[8] Brady v. Maryland, 373 U.S. 83 (1963).

[9] Giglio v. United States, 405 U.S. 150 (1972).

9

Florida's death row filed a second § 2254 habeas petition in which he raised, inter alia, new Brady and Giglio claims. Tompkins v. Sec'y, Dep't of Corr., 557 F.3d 1257, 1259 (11th Cir. 2009). The Eleventh Circuit rejected the petitioner's argument:

> Unlike a Ford claim, the Gardner,[10] Brady, and Giglio claims Tompkins wants to raise are claims that can be and routinely are raised in initial habeas petitions. The violation of constitutional rights asserted in these kinds of claims occur, if at all, at trial or sentencing and are ripe for inclusion in a first petition. Insofar as Tompkins is seeking to raise those three types of claims, this is "the usual case [where] a petition filed second in time and not otherwise permitted by the terms of § 2244 will not survive AEDPA's 'second or successive' bar."
>
> Cutting and pasting language from the Panetti opinion and contorting that language's meaning, Tompkins would have us hold that any claim based on new evidence is not "ripe" for presentation until the evidence is discovered, even if that discovery comes years after the initial habeas petition is filed. That is not what the Supreme Court in Panetti meant by "ripe." Mental competency to be executed is measured at the time of execution, not years before then. A claim that a death row inmate is not mentally competent means nothing unless the time for execution is drawing nigh. It is not ripe years before the time of execution because mental conditions of prisoners vary over time. The reason the Ford claim was not ripe at the time of the first petition in Panetti is not that evidence of an existing or past fact had not been uncovered at that time. Instead, the reason it was unripe was that no Ford claim is ever ripe at the time of the first petition because the facts to be measured or proven—the mental state of the petitioner at the time of execution—do not and cannot exist when the execution is years away. . . .
>
> The stringent requirements that a petitioner must meet before being allowed to assert a claim in a second habeas petition because of newly discovered facts about events that occurred before the filing of the first petition are contained in § 2244(b)(2)(B). Tompkins does not contend that he can satisfy

---

[10] Gardner v. Florida, 430 U.S. 349 (1977).

> those statutory requirements. And even if he wanted to make an attempt at satisfying them, the proper procedure would be to obtain from this Court an order authorizing the district court to consider the second or successive petition. He has not done that.

Tompkins, 557 F.3d at 1260 (citations omitted).[11]

Subsequently, in 2011, the Eleventh Circuit reiterated that a second habeas petition will not avoid being characterized as "second or successive" simply because the factual predicate of a claim was previously undiscoverable. See Stewart v. United States, 646 F.3d 856 (11th Cir. 2011).[12] Rather, only defects that were nonexistent at the time of the petitioner's initial petition will avoid being characterized as "second or successive" in a subsequent petition. See id. at 863. In Stewart, the petitioner's state court convictions that served as predicates for his career offender enhancement were vacated after his initial § 2255 motion was decided. See id. at 856. He filed a second-in-time § 2255 motion seeking vacatur of his career offender enhancement, and the Eleventh Circuit held that "[b]ecause

---

[11] Petitioner argues that the reasoning in Tompkins was "upended" by the Eleventh Circuit's subsequent decision in Zack v. Turner, 704 F.3d 917 (11th Cir. 2013). See Memorandum at 18 n.8; Response at 12. In Zack, the Eleventh Circuit overruled prior precedent that held that AEDPA's one-year period of limitation (28 U.S.C. § 2244(d)(1)) applied to applications as a whole, rather than on a claim-by-claim basis. Zack, 704 F.3d at 918. Specifically, Zack held that AEDPA's one-year period of limitation "applies on a claim-by-claim basis in a multiple trigger date case." Id. at 926. The court found "no reason why a habeas petitioner who allows his judgment to become final should be permitted, by the happenstance of an intervening decision or the discovery of new evidence, to reopen claims that he could have raised earlier but did not." Id. This Court does not view the reasoning in Zack as "upend[ing]" the reasoning in Tompkins. The Tompkins court did not base its holding on the application of the one-year period of limitation.

[12] "Because of the similarities between the provisions governing second or successive petitions under § 2254 and second or successive motions under § 2255, precedent interpreting one of these parallel restrictions is instructive for interpreting its counterpart." Stewart, 646 F.3d at 859 n.6 (citations omitted).

11

the basis for his . . . claim did not exist before his proceedings on his initial § 2255 motion concluded, [the petitioner's] numerically second motion is not 'second or successive.'" Id. at 865; see Boyd v. United States, 754 F.3d 1298, 1301-02 (11th Cir. 2014) (relying on the reasoning of Stewart to find that a fourth § 2255 motion seeking resentencing after the petitioner's prior state court convictions were vacated was not successive). Therefore, when faced with a second-in-time petition, a court must distinguish between a claim that is "based on a factual predicate not previously discoverable," and a claim resulting from a "defect [that] did not arise, or the claim did not ripen, until after the conclusion of the previous petition." Stewart, 646 F.3d at 863 (quotations and citation omitted). The first is successive; the second is not. Id.[13]

Petitioner states in the Response that "Ground 1 is premised upon the documents disclosed in 2016, . . . much of which concerned previously unknown information about Mr. Pough," and Ground 2 "is premised upon the State's admission in the 2016 collateral proceedings in state court" that its firearm examiner's trial "testimony was not accurate." Response at 8, 17. These alleged "defects" and the underlying factual predicates previously recounted, see supra pp. 7-9, all existed during the time in which Petitioner's first federal habeas petition was litigated. While he may not have known of the factual support for these claims until after his initial federal habeas proceeding concluded, and while the State may

---

[13] While Petitioner also cites to cases from other circuits to support his position, see Memorandum at 5-11, this Court is bound by Eleventh Circuit precedent. Indeed, in 2015, the undersigned applied Tompkins and Stewart to find successive a § 2255 motion based on the government's belated disclosure of impeachment evidence. See Scott v. United States, 81 F. Supp. 3d 1326 (M.D. Fla. 2015), appeal docketed, No. 15-11377 (11th Cir. Mar. 31, 2015).

12

have some explaining to do about its almost 30 years late disclosure, Eleventh Circuit precedent dictates that a claim cannot avoid being characterized as second or successive simply because it is based on a factual predicate that was previously undiscoverable. Indeed, AEDPA requires circuit approval of the filing of a second or successive petition that raises claims based on a "factual predicate" that "could not have been discovered previously through the exercise of due diligence." 28 U.S.C. § 2244(b)(2)(B)(i). Thus, Petitioner's path is to seek permission from the Eleventh Circuit to file a successive petition; this Court is without jurisdiction to proceed absent the Eleventh Circuit's permission.

Accordingly, it is

**ORDERED:**

1. The Petition (Doc. 8) is **DISMISSED without prejudice** for lack of jurisdiction.

2. Petitioner's Motion for Discovery (Doc. 13) and Motion for a Stay (Doc. 15) are **DENIED as moot**.

3. The Clerk shall enter judgment dismissing the Petition without prejudice for lack of jurisdiction and close the file.

4. If Petitioner appeals the dismissal of the Petition, the Court denies a certificate of appealability.[14] Because this Court has determined that a certificate of appealability is not

---

[14] This Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), "or that the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (quoting Slack, 529 U.S. at 484). "Where a district court has rejected the constitutional claims on the merits, . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the

13

warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida, this 31st day of July, 2017.

/s/ Timothy J. Corrigan
TIMOTHY J. CORRIGAN
United States District Judge

JAX-3 7/31
c:
Counsel of Record

---

constitutional claims debatable or wrong." Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. After consideration of the record as a whole, the Court will deny a certificate of appealability.